IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JENNIFER SHEPHERD,

    Plaintiff,

  v.              No. 03:12-cv-02218-HZ

KEN L. MCGEE, HUMAN RESOURCES
MANAGER OF THE DEPARTMENT
OF HUMAN SERVICES OF THE        OPINION & ORDER
STATE OF OREGON,

    Defendant.

Glenn Solomon
1001 S.W. Fifth Avenue, #1414
Portland, Oregon 97204

  Attorney for Plaintiff

Ellen F. Rosenblum
ATTORNEY GENERAL
Marc Abrams
SENIOR ASSISTANT ATTORNEY GENERAL
Department of Justice
1515 S.W. Fifth Avenue, Suite 410
Portland, Oregon 97201

  Attorneys for Defendant

1 - OPINION & ORDER

HERNANDEZ, District Judge:

Plaintiff Jennifer Shepherd brings this 42 U.S.C. § 1983 First Amendment retaliation claim against Defendant Ken McGee, the Human Resources Manager for Plaintiff's former employer the Oregon Department of Human Services (DHS). Both parties move for summary judgment. Because I agree with Defendant that DHS's legitimate interests outweigh Plaintiff's First Amendment rights, I grant Defendant's motion and deny Plaintiff's motion.

BACKGROUND

Plaintiff began working for DHS in 2003 as a permanency caseworker. After two years in that position, she became a child protective services (CPS) worker, a position she held until her October 2012 termination. In her position as a CPS worker, Plaintiff investigated reports of child abuse and neglect that came to the attention of DHS. One of her primary functions was to prepare juvenile court cases and make recommendations for juvenile court disposition. The purpose of the work was to determine whether a child was safe in his or her home or should be removed from the home. If a child was not safe in his or her home, Plaintiff would develop a plan to ensure the child's safety. She and the District Attorney's Office would typically jointly file a juvenile petition for protective custody.

According to Plaintiff, although less than ten-percent of her cases went to court, every case had the potential to end up in court and every case was prepared as if it would. Pl. Dep. at 39, 40 (Ex. A to Abrams Decl.). In cases where Plaintiff herself did not file a juvenile petition to start a case, the District Attorney's Office or law enforcement could still subpoena her records. Id. at 41. Plaintiff found herself in court six to eight times per month. Id. at 53. Plaintiff regularly worked with the Polk County District Attorney's Office and the Oregon Department of

2 - OPINION & ORDER

Justice (DOJ) on cases.  Id. at 43.  The person she worked most closely with at the Polk County District Attorney's Office was Deputy District Attorney Max Wall.  Id.  At the DOJ, she worked with Senior Assistant Attorney General Brian Raymer.  Id.

Plaintiff acknowledged that her job was "to be a neutral appraiser of the settings in which the children live[.]" Id. at 40.  In working on dependency cases, she was not supposed to consider the employment status, religious beliefs, or political beliefs of the adults in the home, or concern herself with how they chose to spend money or furnish their home.  Id. at 50-52.  Plaintiff knew that a majority of parents being assessed by DHS were on Temporary Assistance to Needy Families (TANF), food stamps, and/or the Oregon Health Plan.  Id. at 57.

While working at DHS, Plaintiff had a Facebook page.  On that page, she identified herself as a "Child Protective Services Case Worker at Department of Human Services." Id. at 60-61; Ex. C to Abrams Decl.  Plaintiff's Facebook page contained no general disclaimer that any content on the page was her opinion and not that of DHS and she never added such a disclaimer to any particular post.  Id. at 61, 62.  Plaintiff had hundreds of Facebook friends who had access to all of the content Plaintiff posted on her Facebook page.  Id. at 60-61.  Her Facebook friends included a Polk County Circuit Court Judge, at least three deputy district attorneys, several defense attorneys, and over a dozen law enforcement officers.  Id. at 63, 64-67.

While working at DHS, Plaintiff posted the following comment to her Facebook page: "So today I noticed a Self-Sufficiency client getting into a newer BMW.  What am I doing wrong here?  I think I need to quit my job and get on TANF." Ex. C to Abrams Decl.  Several of Plaintiff's Facebook friends made comments in response to the post and Plaintiff herself added the following two comments as well:  (1) "Almost every client home I go into has a gigantic flat

3 - OPINION & ORDER

screen tv. I ask how they paid for it, and it's usually with their tax returns....yet they don't pay taxes!"; and (2) "You should let me know when you send people to jail and I can get their 'benefits' turned off." Id.

In another post, she stated:

> I was listening to the radio and they were making up rules for society. Here are my rules: (1) If you are on public assistance, you may not have additional children and must be on reliable birth control (e.g. an IUD), (2) If you've had your parental rights terminated by DHS, you may not have more children....it's sterilization for you buddy! (3) If you are on public assistance and don't pay taxes, you shouldn't get taxes back from that child tax credit[,] (4) If you are on public assistance, you may not own a big flat screen television, (5) If you receive food stamps, you should be limited on what you may purchase (no more ribeye steaks, candy, soda, chips, etc), (6) If you physically abuse your child, someone should physically abuse you, (7) I should be president so I can make up more rules, (8) If you don't like my rules, too bad. I have a Ph.D. and you don't so I get to make up my own imaginary rules.

Ex. A to Abrams Decl. at 44 (Pl. Dep. Ex. 8).

Plaintiff also added comments in response to comments posted by her Facebook friends including "[o]h, and you can add to my rules, but if your rule sucks then I reserve the right to veto it[,] and "[w]orking at DHS broke me of my liberal ideals from college. Go figure[.]" Id. Plaintiff's posts were seen by Plaintiff's Facebook friends, including defense attorney Mingo Vidrio and Polk County Circuit Court Judge Fred Avera. Pl. Dep. at 136. Plaintiff made the posts in June and July 2012. See Ex. A to Abrams Decl. at 66 (termination letter describing posts).

A DHS manager in Polk County forwarded a packet of information, including Plaintiff's Facebook posts, to McGee. McGee Dep. at 33 (Ex. B to Abrams Decl.). McGee thought the posts reflected Plaintiff's opinions and he did not find them to be "humorous" or "ironic." Id. at

4 - OPINION & ORDER

34-35. He believed that the "rules for society" post showed bias on Plaintiff's part that she was supposed to be putting aside. Id. at 37-38.

On August 1, 2012 DHS held a fact-finding meeting with Plaintiff and a union representative. Ex. A to Abrams Decl. at 67. A DHS Human Resources Analyst, Supervisor, and Program Manager also attended. Id. During the meeting, Plaintiff confirmed that she held some of the beliefs she had written in the Facebook posts and that there was no way of telling from the Facebook posts what she believed and what she did not. Pl. Dep. at 83-84. She also admitted in that meeting that she would have a hard time testifying and explaining her objectivity. Id.

Plaintiff was placed on administrative leave. Pl. Dep. at 144. While she was on leave, DHS spoke with Wall and Raymer about Plaintiff's Facebook posts. Ex. A to Abrams Decl. at 71; Wall Decl. at ¶ 2; Raymer Decl. at ¶ 6. Wall states that he was asked his opinion as to whether the Facebook posts were discoverable material. Wall Decl. ¶ 4. He explained that he thought the content was subject to discovery to opposing counsel and because they were broad statements, not defined to a specific case, he would need to disclose the content to opposing counsel in every dependency hearing involving physical abuse. Id. In his opinion, the content would also likely require questioning as to her viewpoints on the abuse of children each time Plaintiff took the stand in such a case and would likely hamper current and future cases. Id.

Raymer explains that a DHS protective services worker is often the only individual in a position to obtain and record statements from the parents, children, and friends, as well as record observations of the physical surroundings related to a particular case. Raymer Decl. at ¶ 5. In that respect, Raymer states, Plaintiff's role in a case is akin to that of a police officer who

investigates a criminal event, with all the same reliability, credibility, and bias concerns that a police officer is subject to while on the witness stand. Id. In litigating child abuse cases in Polk County, he relied heavily on Plaintiff's ability to present her information in a clear and impartial manner when assessing her materiality and importance as a sworn witness in a hearing or a trial. Id. at ¶ 3. As a result of the content of the Facebook posts, Raymer believes he would never be able to call her to the stand due to her credibility being terminally and irrevocably compromised. Id. at ¶ 4. He believes that he would be ethically obligated to disclose the posts to opposing counsel in any case in which Plaintiff was a witness or potential witness. Id. at ¶ 5.

Raymer states that in his opinion, in every case Plaintiff was involved with and in which she were called to the witness stand, the defense attorney would raise the Facebook postings in order to impeach her and her credibility as a DHS employee. Id. at ¶ 7. Raymer would expect opposing counsel to enter the posts into evidence in each case Plaintiff was involved with and use them to demonstrate her bias. Id. He believes it is possible that her posts would make her incapable of doing anything for DHS. Id. at ¶ 8. As a result of her perceived lack of credibility and demonstrated prejudice, she would not be able to do anything which required discretionary decision making. Id. Finally, Raymer opines that the Facebook posts would create a direct negative impression of Plaintiff and would create lack of trust issues on the part of DHS clients. Id. at ¶ 9. He expects that the posts would reflect adversely and broadly on DHS in the relevant community. Id.

Following the DHS investigation into Plaintiff's Facebook posts, McGee discussed Plaintiff's conduct with several managerial level staff and a consensus was reached that Plaintiff should be terminated. McGee Dep. at 20-21. Ultimately, it was McGee's decision to terminate

Plaintiff. Id. at 16. Plaintiff's termination was effective October 3, 2012 and explained in an eleven-page October 2, 2013 letter signed by McGee. Ex. A to Abrams Decl. at 64-74 (Pl. Dep. Ex. 15).

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. Bias v. Moynihan, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing Celotex, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. Suever v. Connell, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. Earl v. Nielsen Media Research, Inc., 658 F.3d 1108, 1112 (9th Cir. 2011).

If the factual context makes the nonmoving party's claim as to the existence of a material

7 - OPINION & ORDER

issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

DISCUSSION

A First Amendment retaliation claim against a government employer involves

> a sequential five-step series of questions: (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

Eng v. Cooley, 552 F.3d 1062, 1070 (9th Cir. 2009). These five factors are derived from the balancing test articulated in Pickering v. Board of Education which weighs the interest of the employee, as a citizen, in commenting upon matters of public concern and the interest of the government, as an employer, in promoting the efficiency of the public services it performs through its employees. 391 U.S. 563, 568 (1968); Clairmont v. Sound Mental Health, 632 F.3d 1091, 1102-03 (9th Cir. 2011) ("In applying Pickering's balancing test, we employ a sequential five-step inquiry to determine whether a public employee has alleged a violation of his First Amendment rights as a result of government retaliation for his speech[.]"). Plaintiff bears the burden of proof on the first three questions. Eng, 552 F.3d at 1070-71. If Plaintiff meets her burden of proof on those questions, the burden shifts to Defendant to establish that it had an adequate justification for its decision under question four. Id. at 1071-72. If Defendant fails to establish such justification, it may alternatively demonstrate that it would have made the same decision absent the protected speech. Id. at 1072.

8 - OPINION & ORDER

The parties dispute whether Plaintiff's posts constitute speech on a matter of public concern. I need not resolve that issue or whether Plaintiff spoke as a private citizen or public employee because even assuming that the Facebook posts were speech on a matter of public concern and that Plaintiff spoke as a private citizen,[1] I nonetheless grant summary judgment to Defendant because he has shown as a matter of law that DHS had an adequate justification for its termination decision.

The fourth question in the sequential analysis asks whether the government's "legitimate administrative interests outweigh the employee's First Amendment rights." Eng, 552 F.3d at 1071 (internal quotation marks omitted). The question is "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." Garcetti v. Ceballos, 547 U.S. 410, 418 (2006). This inquiry is ultimately a legal question, although its resolution may entail underlying factual disputes. Eng, 552 F.3d at 1071.

Legitimate governmental interests in the First Amendment retaliation balancing inquiry include interests in "promoting efficiency and integrity in the discharge of official duties and maintaining proper discipline in the public service." Clairmont, 632 F.3d at 1107. Additionally, the government may show that an employee's statement "impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Rankin v. McPherson, 483 U.S. 378,

---

[1] There is no dispute as to the third question. Defendant admits that Plaintiff's speech was the reason he terminated her.

9 - OPINION & ORDER

388 (1987); see also Pool v. VanRheen, 297 F.3d 899, 909 (9th Cir. 2002) (same). The government's interest in avoiding disruption is magnified when the employee serves in a "public contact role." Pool, 297 F.3d at 908 (internal quotation marks omitted).

    Defendant argues that Plaintiff's Facebook posts irreparably impaired her ability to perform her duties. External communications have been found to compromise a public employee's ability to perform his or her job. E.g., Pool, 297 F.3d at 909 (statements by sheriff's officer commander made in a meeting and reported in newspaper interfered with functioning of sheriff's department and caused sheriff to lose confidence in commander's judgment and her ability to be effective in her job). Defendant cites to Plaintiff's own description of her duties as a CPS worker to support the need for her to testify in juvenile court hearings and to prepare each case as if it would end up in court. Plaintiff herself testified in deposition that she was in court six to eight times per month. Plaintiff does not dispute these facts.

    Next, Defendant cites to the information provided to DHS during its investigation of Plaintiff's Facebook posts by Wall and Raymer that Plaintiff's credibility as a witness and thus her effectiveness, was permanently compromised. Both attorneys determined that Plaintiff's bias would have to be disclosed to opposing counsel in all cases. Wall believed Plaintiff's posts would hamper current and future cases. Raymer called Plaintiff "terminally and irrevocably compromised" and stated that her Facebook posts would prevent him from ever calling her as a witness. He also opined that her statements would create trust issues with DHS clients and would reflect adversely on DHS in the relevant local community.

    Examining Plaintiff's duties and considering the information provided by Wall and Raymer, Defendant argues that it is indisputable that Plaintiff's actions compromised her ability

to effectively perform her job and the operations of DHS and thus, the government's interest in maintaining efficient operations outweighs Plaintiff's free speech rights. In response, Plaintiff argues that Defendant fails to establish "actual, material and substantial disruption, or reasonable predictions of disruption in the workplace." Clairmont, 632 F.3d at 1107 (internal quotation marks omitted). Plaintiff contends there is no evidence that her speech actually caused disruption in the workplace and her credibility as a witness was never actually impeached. She further argues that Wall's opinion about her competency as a witness is not entitled to any weight given that his superiors disagreed with him on this issue.

      Plaintiff's argument is unavailing for several reasons. First, both Wall's and Raymer's Declarations establish actual, material, and substantial disruption to their working relationships with Plaintiff. Even without actually having her testimony impeached at a hearing, Plaintiff's Facebook posts caused Wall and Raymer to doubt her ability to be effective. That doubt, even without anything more, is a disruption to those working relationships and is evidence that her ability to perform that aspect of her job would be impaired. Second, because Plaintiff was placed on administrative leave and unavailable to Wall or Raymer during her leave and then she was terminated, there was no opportunity for Wall or Raymer to use Plaintiff as a witness. The government employer does not have to compromise its function by allowing the employee to actually cause disruption or fail to perform his or her job duties in order to establish an impairment in efficient operations.

      Third, the testimony by Wall's superiors does not create a genuine dispute of fact and even if it does, Raymer's testimony remains uncontradicted. Jennifer Gaddis was formerly the Chief Deputy District Attorney for the Polk County District Attorney's Office. Gaddis Affid. at ¶

11 - OPINION & ORDER

2. Most of Gaddis's caseload consisted of prosecuting people for sexual offenses against young children and she and Plaintiff often interacted on those cases. Id. at ¶ 3. Because Plaintiff would usually have met the child before the District Attorney's office was involved in the case, Gaddis would ask Plaintiff her opinion regarding the fears or challenges the child might have in giving testimony. Id. Gaddis regarded Plaintiff as one of the best case workers at DHS. Id.

Gaddis states that Wall was her subordinate and that he primarily carried a juvenile caseload. Id. at ¶ 5. According to Gaddis, Wall "was never authorized to make such a determination about [Plaintiff]." Id. Rather, "[s]omething of this nature would be a determination for the District Attorney to make." Id. Gaddis was concerned that neither she nor then-Polk County District Attorney Stan Butterfield were consulted about using Plaintiff as a witness. Id. Gaddis then offers her opinion as to Plaintiff's comments, including that she believes they were a "form of venting about the frustrations of [Plaintiff's] then-profession" and that it was "apparent from the context that they were not meant seriously." Id. at ¶ 9. In Gaddis's opinion, the Facebook posts were not "Brady" material[2] and she would have continued to use Plaintiff as a witness had Plaintiff not been terminated. Id. at ¶¶ 7, 8, 9.

Butterfield, presently an attorney in private practice, states that when he served as Polk County District Attorney, his Chief Deputy Gaddis worked with Shepherd and used her in "sex" cases. Butterfield Affid. at ¶ 3. Butterfield states that he has read Gaddis's Affidavit and agrees with the statements Gaddis makes there. Id. at ¶ 4. He also offers his opinion that Plaintiff's

---

[2] Under Brady v. Maryland, 373 U.S. 83 (1963) and subsequent cases, the prosecution in a criminal case is required to disclose material, favorable evidence to an accused. "Favorable" means exculpatory or impeaching. See, e.g., Gladwell v. DeCamp, No. 03:10–cv–00061–BR, 2012 WL 5182804, at *7 (D. Or. Oct. 16, 2012) (explaining prosecution's Brady obligations).

Facebook posts were "apparently intended for comic effect" and did not impair Plaintiff's credibility. Id. at ¶¶ 7, 8. He would not have prohibited Gaddis from using Plaintiff as a witness based on the Facebook posts. Id. at ¶ 6. He further states that he agrees that Wall "exceeded" his authority in taking any action which would have resulted in any form of discipline against Plaintiff. Id. at ¶ 9.

Neither of these affidavits creates a dispute that Wall was the person at the Polk County District Attorney's Office with whom Plaintiff worked most closely. Pl. Dep. at 43. Neither of these affidavits creates a dispute that the type of dependency case handled by Wall in juvenile court was different than the criminal sex offense cases handled by Gaddis. See Wall Decl. at ¶ 5 (noting that neither Butterfield nor Gaddis handled juvenile dependency cases and that Gaddis prosecuted adult criminal cases which occasionally required testimony from DHS workers as witnesses). And, despite assertions that Wall somehow acted beyond his authority, there is no evidence that Wall did anything other than respond to queries by DHS seeking his opinion about the effect of Plaintiff's Facebook posts on his use of Plaintiff as a witness. There is no evidence in the record suggesting that Wall was asked whether DHS should discipline Plaintiff or had any input into a termination decision. Thus, Butterfield's statement implying that Wall took some action that resulted in discipline against Plaintiff is contrary to the record and unsupported.

At best, the affidavits show that Wall's supervisors disagreed with his opinion about the impact of Plaintiff's Facebook posts on Plaintiff's appearance as a witness. Their differing opinions, however, do not undermine the undisputed fact that Wall had a contrary opinion and one which unquestionably demonstrates that at least in Wall's cases, Plaintiff would be a compromised witness. Wall's professional judgment is that using Plaintiff as a witness in his

cases created issues of bias and credibility such that Wall felt obligated to consider the Facebook posts to be discoverable material which would hamper current and future cases.

Additionally, the government, as employer, is not required to render a decision regarding an employee based on procedures and evidentiary rules used in court. Waters v. Churchill, 511 U.S. 661, 676-77 (1994) (explaining that "[g]overnment employers should be allowed to use personnel procedures that differ from the evidentiary rules used by courts, without fear that these differences will lead to liability") (plurality opinion). Rather, the government's decision must be in good faith and be supported by a reasonable investigation into the facts. Id. ("employer decisionmaking will not be unduly burdened by having courts look to the facts as the employer *reasonably* found them to be"). Accordingly, it is not enough for Plaintiff to show that Gaddis and Butterfield presently dispute Wall's opinion. Instead, Plaintiff must be able to demonstrate that McGee's decision was not in good faith and was based on an unreasonable investigation. Although Plaintiff contends that the prediction of disruption in Plaintiff's ability to perform her job was unreasonable and premature, Plaintiff does not argue that DHS's investigation into the facts, including the fact that Wall believed Plaintiff had lost her credibility as a witness, was unreasonable. Arguing that the conclusion reached is unreasonable is not the same as arguing that the investigation was unreasonable. Thus, under Waters, Gaddis's and Butterfield's affidavits do not create a material dispute regarding the relevance and materiality of Wall's opinion and the affidavits do not undermine DHS's reliance on Wall's opinion in its investigation of Plaintiff's Facebook posts.

Even if Gaddis's and Butterfield's affidavits rendered Wall's opinion unreliable, the record contains statements by Plaintiff herself that she was biased and unobjective. The record also

contains the uncontradicted opinion of Raymer that Plaintiff had lost all credibility as a witness and created trust issues for DHS clients and credibility problems for the agency.  Plaintiff admitted during her August 1, 2012 fact finding hearing that (1) her "rules for society" Facebook post contained her "biased opinions"; (2) several of these Facebook statements showed bias against DHS clients; (3) at least one of those statements was not in line with the DHS goal of keeping people safe; (4) she believed her Facebook friends would not want her as a caseworker for a relative receiving food stamps or TANF; (5) her Facebook post regarding unemployed recipients of public assistance spending money in a way Plaintiff disapproved of showed her lack of credibility and biases; (6) she would look biased and would have a hard time testifying and explaining how she was objective if her Facebook posts were used in court; and (7) her biases reflect negatively on DHS.  Ex. A to Abrams Decl. at 67-72; see also Pl. Dep. at 83-84.

        Plaintiff does not challenge the evidence that she made these statements at her fact finding hearing.  McGee expressly cited them in his termination letter.  It is therefore undisputed that Plaintiff's Facebook posts created credibility problems for her in fulfilling the duties of her position.  Additionally, as recited above, Raymer concluded that he could never use her again as a witness.  Thus, even without considering Wall's opinion at all, Defendant has established as a matter of law that Plaintiff's Facebook posts significantly impaired her ability to perform her job and created credibility issues for DHS.

        As a result, the case Plaintiff relies on, Clairmont, is distinguishable.  There, the defendant argued on summary judgment that the content of the plaintiff's protected speech interfered with the relevant working relationship.  632 F.3d at 1107.  The court found, however, that the defendant cited no evidence in the record to support her allegation: "there is no evidence

in the summary judgment record substantiating [defendant] Wilson's allegations of disruption in the workplace." Id. at 1108.  In contrast, the record in this case indisputably establishes that Plaintiff's Facebook posts created substantial interference with her ability to perform at least one important duty of her job.

In balancing the interests of the government employer and the public employee, the employer must show greater disruption to its provision of services when the speech is at the core of First Amendment protection or is directed at a large audience; correspondingly, the employer is given wider deference when the speech is at the edge of First Amendment protection, a smaller audience is targeted, or a close working relationship is at stake.  See Brewster v. Bd. of Educ.of Lynwood Unified Sch. Dist., 149 F.3d 971, 981 (9th Cir. 1998) (in weighing interests, it is significant whether the speech at issue was made to the public or the media or instead to a more private audience); Johnson v. Multnomah Cnty., 48 F.3d 420, 426 (9th Cir. 1995) ("The more tightly the First Amendment embraces the speech the more vigorous a showing of disruption must be made.") (internal quotation marks omitted).

Plaintiff's Facebook settings allowed only her designated Facebook friends to view her Facebook posts.  Pl. Dep. at 62.  And, while the subjects of tax credits or the use of government resources or entitlement programs are arguably matters of public concern, Plaintiff's comments did not strike at the heart or core of the First Amendment given her own characterization of them as "humorous and ironic" and "joke[s]"  Am. Compl. at ¶ 10; Pl. Dep. at  69, 73 (Ex. B to Solomon Decl.).  As such, they are more on the periphery of First Amendment protection because they were banter rather than speech intended to help the public actually evaluate the performance of a public agency.  See Clairmont, 632 F.3d at 1103-04 ("Speech that helps the

public evaluate the performance of public agencies addresses a matter of public concern"). Thus, assuming for the purposes of this Opinion that the posts are entitled to First Amendment protection, they were not distributed to the public or the media but were targeting a smaller audience and they are not at the core of First Amendment protection. As a result, the government has more deference in determining whether the speech at issue has interfered with its operations or with the employee's ability to effectively perform his or her duties. And as noted above, the government's interest carries even more weight when the employee is in a "public contact role" which Plaintiff was. When weighing the respective interests in this case, the balance unquestionably tips in favor of DHS.

Even if Plaintiff had widely distributed her comments to the public and even if they struck at the core of First Amendment protection, the balance would still tip in DHS's favor given the record of potential disruption. Defendant has established as a matter of law that he had an adequate justification for treating Plaintiff differently than any other member of the general public.[3]

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[3] Given my determination on the merits, I do not consider Defendant's alternative qualified immunity argument.

17 - OPINION & ORDER

## CONCLUSION

Defendant's motion for summary judgment [17] is granted and Plaintiff's motion for summary judgment [28] is denied.

IT IS SO ORDERED.

Dated this 7 day of November, 2013

/s/ Marco Hernandez
Marco A. Hernandez
United States District Judge

18 - OPINION & ORDER